Filed 6/11/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANGELE LASALLE, | |
| Plaintiff and Respondent, | G055381 |
| v. | (Super. Ct. No. 30-2016-00836641) |
| JOANNA T. VOGEL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Reversed with directions.

Law Offices of Dorie A. Rogers, Dorie A. Rogers and Lisa R. McCall for Defendant and Appellant.

Law Office of Frank W. Battaile and Frank W. Battaile for Plaintiff and Respondent.

Here is what Code of Civil Procedure[1] section 583.130 says: "It is the policy of the state that a plaintiff shall proceed with reasonable diligence in the prosecution of an action but that all parties shall cooperate in bringing the action to trial or other disposition." That is not complicated language. No jury instruction defining any of its terms would be necessary if we were submitting it to a panel of non-lawyers. The policy of the state is that the parties to a lawsuit "shall cooperate." Period. Full stop.

Yet the principle the section dictates has somehow become the *Marie Celeste* of California law – a ghost ship reported by a few hardy souls but doubted by most people familiar with the area in which it's been reported. The section's adjuration to civility and cooperation "is a custom, More honor'd in the breach than the observance."[2] In this case, we deal here with more evidence that our profession has come unmoored from its honorable commitment to the ideal expressed in section 583.130, and – in keeping with what has become an unfortunate tradition in California appellate law – we urge a return to the professionalism it represents.

FACTS

From 2011 to 2015, Appellant Attorney Joanna T. Vogel (Vogel) represented plaintiff/respondent Angele Lasalle (Lasalle) in the dissolution of a registered domestic partnership with Minh Tho Si Luu. Lasalle repeatedly failed to provide discovery in that case, and the court defaulted her as a terminating sanction. She said her failure to provide discovery was caused by Vogel not keeping her informed of discovery orders, so she sued Vogel for legal malpractice.

Vogel was served with the complaint on March 3, 2016. Thirty five days went by. On the 36th day, Thursday April 7, Lasalle's attorney sent Vogel a letter and an

---

[1]     All further statutory references are to the Code of Civil Procedure unless otherwise indicated.
[2]     Hamlet, Act I, Scene 4, ll. 15-16.

2

email – the content was the same – telling her that the time for a responsive pleading was "past due" and threatening to request the entry of a default against Vogel unless he received a responsive pleading by the close of business the next day, Friday April 8. Our record does not include the time of day on Thursday when either the email was sent or the letter mailed, so we cannot evaluate the chance of the letter reaching Vogel in Friday's post except to say it was slim.

Counsel did not receive any response from Vogel by 3 p.m. the following Monday, April 11. He filed a request for entry of default and emailed a copy to Vogel at 4:05 p.m. That got Vogel's attention and she emailed her request for an extension at 5:22 p.m., but by then the default was a fait accompli.

Vogel acted rather quickly now that her default had been entered. She found an attorney by Friday April 15th,[3] and that attorney had a motion to set aside the default on file a week later. We quote the entirety of Lasalle's declaration in support of the set aside motion in the margin.[4]

Vogel's set-aside motion was made pursuant to those provisions of subdivision (b) of section 473 that commit the matter to the trial court's discretion in

---

[3] It took Vogel four days because she initially contacted an attorney who had just decided to represent one of the codefendants – other attorneys who had represented Lasalle, but are not parties to this appeal.

[4] "I am an attorney at law, and the defendant in this matter. [¶] When I was served with the summons and complaint, I was in the middle of a number of family law matters in court as the attorney. [¶] I was also involved in my own divorce, wherein I had just discovered my husband had failed to pay the taxes on our property, and it had gone into default. Also he failed to pay the mortgage on the family residence and it went into default. [¶] I received the summons and complaint and the discovery and had met with an attorney to represent me. I then learned that the lawyer had just associated with one of the other defendants in this matter. [¶] I therefore, determined to find a new attorney and contacted the plaintiff's attorney to request a brief extension to respond to the complaint. While waiting to hear back and without having the courtesy of the extension, I received the notice of default. [¶] I was served with discovery before I even answered the complaint, and had begun to work on that as well. [¶] I am a single mother and between taking care of the family, the practice of law, and trying to revive [*sic*] the files of from the plaintiff, I did fail to timely file my answer. [¶] As soon as I could, I contacted [the attorney who filed the motion] and retained him to represent me. I provided for him the summons and complaint, but have yet to gather the files together to answer what appears to be an unverified complaint. [¶] I have attached hereto my proposed answer. [¶] I state the above facts to be true and so state under penalty of perjury this 16th day of April in Fullerton, California."

Vogel's counsel at the time is not Vogel's appellant's counsel on appeal.

cases of "mistake, inadvertence, surprise, or excusable neglect." There was no "falling on the sword" affidavit of fault that might have triggered application of those provisions of section 473 *requiring* a set-aside when an attorney confesses fault.

In opposing relief, respondent's counsel asked the trial court to take judicial notice of state bar disciplinary proceedings against Vogel stemming from two unrelated cases, which had resulted in a stayed suspension of Vogel's license to practice. The court denied the set-aside motion in a minute order filed June 9, 2016, in which the trial judge expressly took judicial notice of Vogel's prior discipline. A year later, a default judgment was entered against Vogel for $1 million. She has appealed from both that judgment and the order refusing to set aside the default.

We sympathize with the court below and opposing counsel. We have all encountered dilatory tactics and know how frustrating they can be. But we cannot see this as such a situation, and cannot countenance the way this default was taken, so we reverse the judgment.

## DISCUSSION

Three decades ago, our colleagues in the First District, dealing with a case they attributed to a "fit of pique between counsel," addressed this entreaty to California attorneys, "We conclude by reminding members of the Bar that their responsibilities as officers of the court include professional courtesy to the court and to opposing counsel. All too often today we see signs that the practice of law is becoming more like a business and less like a profession. We decry any such change, but the profession itself must chart its own course. The legal profession has already suffered a loss of stature and of public respect. This is more easily understood when the public perspective of the profession is shaped by cases such as this where lawyers await the slightest provocation to turn upon each other. Lawyers and judges should work to improve and enhance the rule of law, not allow a return to the law of the jungle." (*Lossing v. Superior Court* (1989) 207 Cal.App.3d 635, 641.)

4

In 1994, the Second District lambasted attorneys who were cluttering up the courts with what were essentially personal spats. In the words of a clearly exasperated Justice Gilbert, "If this case is an example, the term 'civil procedure' is an oxymoron." (*Green v. GTE California* (1994) 29 Cal.App.4th 407 408.)

In 1997, another appellate court urged bench and bar to practice with more civility. "The law should not create an incentive to take the scorched earth, feet-to-the-fire attitude that is all too common in litigation today." (*Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 17.)

By 2002, we had lawyers doing and saying things that would have beggared the imagination of the people who taught us how to practice law. We had a lawyer named John Heurlin who wrote to opposing counsel, "I plan on disseminating your little letter to as many referring counsel as possible, you diminutive shit." Admonishing counsel to "educate yourself about attorney liens and the work product privilege," Mr. Heurlin closed his letter with the clichéd but always popular, "See you in Court." That and other failures resulted in Mr. Heurlin being sanctioned $6,000 for filing a frivolous appeal and referred to the State Bar. Our court thought publishing the ugly facts of the case, which they did in *DeRose v. Heurlin* (2002) 100 Cal.App.4th 158, would get the bar's attention. It didn't.

Almost a decade later, in a case called *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1537, the First District tried again. They said, "We close this discussion with a reminder to counsel – all counsel, regardless of practice, regardless of age – that zealous advocacy does not equate with 'attack dog' or 'scorched earth,' nor does it mean lack of civility. [Citations.] Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive."

Six months later, our court said this, "Our profession is rife with cynicism, awash in incivility. Lawyers and judges of our generation spend a great deal of time

5

lamenting the loss of a golden age when lawyers treated each other with respect and courtesy. It's time to stop talking about the problem and act on it. For decades, our profession has given lip service to civility. All we have gotten from it is tired lips. We have reluctantly concluded lips cannot do the job; teeth are required. In this case, those teeth will take the form of sanctions." We sanctioned counsel $10,000. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 293 (Kim).)

This is not an exhaustive catalogue. Were we writing a compendium rather than an opinion, we could include keening from every state, because, "Incivility in open court infects the process of justice in many ways. It compromises the necessary public trust that the system will produce fair and just results; it negates the perception of professionalism in the legal community, and it erodes respect for all people involved in the process." (*In re Hillis* (Del. 2004) 858 A.2d 317, 324.)

Courts have had to urge counsel to turn down the heat on their litigation zeitgeist far too often. And while the factual scenarios of these cases differ, they are all variations on a theme of incivility that the bench has been decrying for decades, with very little success.

It's gotten so bad the California State Bar amended the oath new attorneys take to add a civility *requirement*. Since 2014, new attorneys have been required to vow to treat opposing counsel with "dignity, courtesy, and integrity."

That was not done here. Dignity, courtesy, and integrity were conspicuously lacking.

We are reluctant to come down too hard on respondent's counsel or the trial court because we think the problem is not so much a personal failure as systemic one. Court and counsel below are merely indicative of the fact practitioners have become inured to this kind of practice. They have heard the mantra so often unthinkingly repeated that, "This is a business," that they have lost sight of the fact the practice of law

6

is *not* a business.  It is a profession.  And those who practice it carry a concomitantly greater responsibility than businesspeople.

So what we review in this case is not so much a failure of court and counsel as an insidious decline in the standards of the profession that must be addressed.  "The term 'officer of the court,' with all the assumptions of honor and integrity that append to it must not be allowed to lose its significance." (*Kim, supra*, at p. 292.)  We reverse the order in this case because that significance was overlooked.

An order denying a motion to set aside a default is appealable from the ensuing default judgment.  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981 (*Rappleyea*).)  We acknowledge the standard of review for an order denying a set aside motion is abuse of discretion.  (*Ibid.*)  But there is an important distinction in the way that discretion is measured in section 473 cases.  The law favors judgments based on the merits, not procedural missteps.  Our Supreme Court has repeatedly reminded us that in this area doubts must be resolved *in favor of relief*, with an order denying relief scrutinized more carefully that an order granting it.  As Justice Mosk put it in *Rappleyea*, "Because the law favors disposing of cases on their merits, 'any doubts in applying section 473 must be resolved in favor of the party seeking relief from default [citations].  Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits.' (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233; see also *Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1136.)" (*Id.* at p. 980.)[5]

Warning and notice play a major role in this scrutiny.  Six decades ago, when bench and bar conducted themselves as a profession, another appellate court, in language both apropos to our case and indicative of how law ought to be practiced, said,

---

[5]       Indeed, some cases go so far as to say "'very slight evidence will be required to justify a court in setting aside the default.' [Citation.]" (*Miller v. City of Hermosa Beach, supra,* at p. 1136.)  More on this point below.

7

"The quiet speed of plaintiffs' attorney in seeking a default judgment without the knowledge of defendants' counsel is not to be commended." (*Smith v. Los Angeles Bookbinders Union* (1955) 133 Cal.App.2d 486, 500 (*Bookbinders*).)[6]

In contrast to the stealth and speed condemned in *Bookbinders*, courts and the State Bar emphasize warning and deliberate speed. The State Bar Civility Guidelines deplore the conduct of an attorney who races opposing counsel to the courthouse to enter a default before a responsive pleading can be filed. (*Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 702 (*Fasuyi*), quoting section 15 of the California Attorney Guidelines of Civility and Professionalism (2007).) Accordingly, it is now well-acknowledged that an attorney has an *ethical* obligation to warn opposing counsel that the attorney is about to take an adversary's default. (*Id.* at pp. 701-702.)

In that regard we heartily endorse the related admonition found in The Rutter Group practice guide, and we note the authors' emphasis on *reasonable time*: "Practice Pointer: If you're representing plaintiff, and have had *any* contact with a lawyer representing defendant, don't even *attempt* to get a default entered without first giving such lawyer *written* notice of your intent to request entry of default, and a *reasonable time* within which defendant's pleading must be filed to prevent your doing so." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2008) § 5:73, p. 5-19 (rev. #1, 2008) as quoted in *Fasuyi, supra*, 167 Cal.App.4th at p. 702.)

To be sure, there is authority to the effect giving any warning at all is an "ethical" obligation as distinct from a "legal" one. The appellate case usually cited these days for this ethical-legal dichotomy is *Bellm v. Bellia* (1984) 150 Cal.App.3d 1036, 1038 (*Bellm*). Indeed, it was the most recent case cited by the trial court's minute order denying Vogel's set aside motion.

---

[6] Disapproved *on other grounds* in *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 551.

*Bellm* was written at a time when incivility was surfacing as a problem in the legal profession.[7] "Like tennis, the legal profession used to adhere to a strict etiquette that kept the game mannerly. And, like tennis, the law saw its old standards crumble in the 1970s and 1980s. Self-consciously churlish litigators rose on a parallel course with Jimmy Connors and John McEnroe." (Gee & Garner, *The Uncivil Lawyer:* (1996) 15 Rev. Litig. 177, 190.) Thus the majority opinion in *Bellm* lamented the "lack of professional courtesy" in counsel's taking a default without warning (See *Bellm, supra*, 150 Cal.App.3d at p. 1038 ["we decry this lack of professional courtesy"]) but deemed it an ethical issue rather than a legal one and affirmed the trial court's denial of relief. The *Bellm* dissent would have found an abuse of discretion. (*Bellm, supra,* 150 Cal.App.3d at p. 1040 (dis. opn. of Haning J.).)

But *Bellm* was handed down on January 19, 1984. That was only two weeks after section 583.130, quoted above, went into effect. The section obviously could not have been briefed or argued in that case, so the *Bellm* court did not have the benefit of the statute. The statute was passed to curb what the Legislature considered an inappropriate rise in motions to dismiss for lack of prosecution – sometimes brought, like this one, as soon as a time limit was exceeded. As the Law Revision Commission phrased it:

"Over the years the attitude of the courts and the Legislature toward dismissal for lack of prosecution has varied. From around 1900 until the 1920's the dismissal statutes were strictly enforced. Between the 1920's and the 1960's there was a process of liberalization of the statutes to create exceptions and excuses. Beginning in the late 1960's the courts were strict in requiring dismissal. In 1969, an effort was made in the Legislature to curb discretionary court dismissals, but ended in authority for the

---

[7] The incivility lamentations we quoted earlier began in 1989, although this case certainly falls into the voice-crying-in-the-desert type of entreaty that grew louder a few years later.

9

Judicial Council to provide a procedure for dismissal. In 1970, the courts brought an abrupt halt to strict construction of dismissal statutes and began an era of liberal allowance of excuses that continued to the early 1980's. The judicial attitude in the latter time was stated by the Supreme Court: 'Although a defendant is entitled to the weight of the policy underlying the dismissal statute, which seeks to prevent unreasonable delays in litigation, the policy is less powerful than that which seeks to dispose of litigation on the merits rather than on procedural grounds.'" (*Wheeler v. Payless Super Drug Stores* (1987) 193 Cal.App.3d 1292, 1295, quoting *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566; see also *Hocharian v. Superior Court* (1981) 28 Cal.3d 714.)

So to the extent it was possible for a party seeking a default with unseemly haste to commit an *ethical* breach without creating a *legal* issue, that distinction was erased by section 583.130. The ethical obligation to warn opposing counsel of an intent to take a default is now reinforced by a statutory policy that all parties "cooperate in bringing the action to trial or other disposition." (§ 583.130.) Quiet speed and unreasonable deadlines do not qualify as "cooperation" and cannot be accepted by the courts.

We cannot accept it because it is contrary to legislative policy and because it is destructive of the legal system and the people who work within it. Allowing it to flourish has been counterproductive and corrosive. First, it has led to increased litigation. Unintended defaults inevitably result in motions to overturn them (this case, exemplary in no other way, demonstrates well the resources consumed by such motions) or lawsuits against the defaulted party's attorney (who thought enough of his client's position to agree to represent him and then bungled it). There are plenty of demands on our legal resources without adding such matters.

But worse than that, it forces practitioners to sail between Scylla and Charybdis. They are torn between the civility we teach in law schools, require in their oath, and legislate in statutes like section 583.130, and their obligation to represent their

10

client as effectively as possible. We ask too much of people with families and mortgages – not to mention ex-spouses who fail to make tax and mortgage payments – when we ask them to choose "dignity, courtesy, and integrity" over easy "fish in a barrel" victories that are perceived to have statutory support. We owe ourselves an easier choice, and the legislature has given it to us in section 583.130.

With that in mind, we conclude that by standards now applicable to such motions, the trial judge here abused his discretion in not setting aside the default. Several factors combine to convince us of that.

The first is the use of email to give "warning." Email has many things to recommend it; reliability is not one of them. Between the ease of mistaken address on the sender's end and the arcane vagaries of spam filters on the recipient's end, email is ill-suited for a communication on which a million dollar lawsuit may hinge.[8] A busy calendar, an overfull in-box, a careless autocorrect, even a clumsy keystroke resulting in a "delete" command can result in a speedy communication being merely a failed one.

We all learned in law school that due process requires not just notice, but notice reasonably calculated to *reach* the object of the notice. (See *Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 318.) While there is no due process problem in the case before us now (Vogel has not complained she wasn't actually served), emails are a lousy medium with which to warn opposing counsel that a default is about to be taken. We find it significant that by law emails are insufficient to serve notices on counsel in an ongoing case without prior agreement and written confirmation. (§§ 1013, subd. (e); 1010.6, subd. (a)(2)(A)(ii); Cal. Rules of Court, rule 2.251(b).)

Indeed, the sheer ephemerality of emails poses unacceptable dangers for issues as important as whether an *entire case* will be decided by default and not on the

---

[8] The default judgment obtained against Lasalle by respondent was exactly $1,000,000.

11

merits. While some emails seem to live on for years despite efforts to bleach them out, others have the half-life of a neutrino. We ourselves have learned the hard way that spam filters can ambush important, non-advertising messages from lawyers who have an important legal purpose and keep them from reaching their intended destination – us. We have, on occasion, had to reschedule oral arguments because notices to counsel of oral argument dates and times sent by email got caught in spam filters and did not reach those counsel, or their requests for accommodation did not reach us.

The choice of email to announce an impending default seems to us hardly distinguishable from stealth. And since the other course adopted by respondent's trial attorney was mailing a letter on Thursday in which he demanded a response by Friday, it is difficult to see this as a genuine warning – especially when 19th century technology – the telephone – was easily available and orders of magnitude more certain.

The second factor we consider is the short-fuse deadline given by respondent's counsel. It was *unreasonably* short. It set Vogel up to have her default taken immediately. "[T]he quiet taking of default on the beginning of the first day on which defendant's answer was delinquent was the sort of professional discourtesy which, under [*Bookbinder*] justified vacating the default." (*Robinson v. Varela* (1977) 67 Cal.App.3d 611, 616 (*Robinson*).)

The third factor is the total absence of prejudice to Lasalle from any set-aside, given the relatively short time between respondent seeking the default and Vogel asking to be relieved from it. "When evaluating a motion to set aside a default judgment on equitable grounds, the 'court must weigh the reasonableness of the conduct of the moving party in light of the extent of the prejudice to the responding party.'" (*Mechling v. Asbestos Defendants* (2018) 29 Cal.App.5th 1241, 1248-1249.) Setting aside *this* default would have involved little wasted time, and the de minimis expenses incurred could have been easily recompensed.

12

The fourth factor is the unusual nature of the malpractice claim in this case. Some cases are suited for defaults: An impecunious debtor who is sued for an unquestionably meritorious debt may very well make a rational decision not to spend good money after bad by contesting the case. (See *Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1751 [discussing dynamics bearing on whether a defendant might elect to default a given claim].) But this legal malpractice action covering the entirety of a family law action lies at the opposite end of the spectrum.

Because of the facts alleged in the complaint – namely that Vogel had been responsible for losing Lasalle's *entire* dissolution case – Lasalle's damages called for litigation of multiple items of property characterization, credits, reimbursement claims, and perhaps even claims for support. (See *d'Elia v. d'Elia* (1997) 58 Cal.App.4th 415, 418, fn. 2 ["every item of marital property presents a host of challenging issues"].) This means the malpractice claim here was going to require a trial within a trial about some complex issues indeed. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 [plaintiff must prove that "*but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred."].) That's pretty much the opposite of simple debt collection.

A fifth factor favoring a set-aside here was the presence of a plainly meritorious defense to at least part of Lasalle's default judgment. That judgment eventually included emotional distress damages of $100,000. Those damages are contrary to law. In *Smith v. Superior Court* (1992) 10 Cal.App.4th 1033, 1038-1039, this court squarely held that emotional distress damages are not recoverable in an action for family law legal malpractice. Even if we were not directing the trial court to set aside the default, we would have to reduce the judgment by at least this amount as contrary to law, and its inclusion only underscores the impossibility of respondent's 24-hour deadline for answering the complaint.

Next, there was the trial court's taking judicial notice of, and reliance on, Vogel's two previous instances of discipline for not having properly communicated with clients on previous cases. Evidence Code section 1101 represents the Legislature's general disapproval of the use of specific instances of a person's character to establish some bad act. We note the statute is not limited to criminal cases by its terms,[9] though it usually shows up in criminal cases. (See *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1176 ["The purpose of this evidentiary rule 'is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history.' [Citation.]".) Nonetheless, the point is the same: judicial decisions should fit the facts of a case and not be based on some general evaluation of a person's personal history. The fact Vogel had failed to comply with standards of professional conduct in the past should not have colored the determination of whether she deserved an extension in this case.

And finally, we are disappointed that Vogel's explanation of her botched reply in this case was not considered adequate. A single mother who is juggling the

---

9      Subdivision (a) of which provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." By their terms all four statutory exceptions are limited to criminal actions.

inevitable pressures of that role and a caseload of family law matters, and has just learned that her ex- has failed to pay the property taxes or make the house payment – thus, ironically, throwing those into default – deserves some consideration.

To be sure, Vogel's declaration in support of her set aside might have been more polished – but then again she had very little time to prepare it. As we have noted, one of the considerations in a section 473 motion is how much time has elapsed since the default. The clock was ticking, and the obligations noted in the last paragraph were not about to disappear.

In a case like this one, where there would have been no real prejudice had the set-aside motion been granted, the rule is that a party's negligence in allowing a default to be taken in the first place "will be excused on a *weak showing*." (*Aldrich v. San Fernando Valley Lumber Co.* (1985) 170 Cal.App.3d 725, 740, italics added.) Vogel's declaration crossed that threshold.

We do not hold that every section 473 motion supported by a colorable declaration must be granted. Since every section 473 motion must be evaluated on its own facts, we can hold only that *this one* should have been granted. As we have said, Vogel was notified by unsatisfactory means of an unreasonably short deadline (just being out of the office for one day – for example, *on another case* – would have prevented her from meeting it), and she had significant family emergencies of her own, including an urgent need to take care of taxes and unpaid mortgage payments lest she lose her home. *Her* neglect was excusable. (See *Robinson, supra,* 67 Cal.App.3d at p. 616 [noting short period of time to respond, press of business, limited office hours during a holiday period and defense counsel's preoccupation with other litigated matters made failure to timely file an answer "excusable"].) We hope the next attorney in these straits will not have such a compelling set of facts to offer . . . and that opposing counsel will act with "dignity, courtesy, and integrity."

CONCLUSION AND DISPOSITION

15

Supreme Court Chief Justice Warren Burger long ago observed, "[L]awyers who know how to think but have not learned how to behave are a menace and a liability . . . to the administration of justice. . . . [¶] . . . [T]he necessity for civility is relevant to lawyers because they are the living exemplars – and thus teachers – every day in every case and in every court and their worst conduct will be emulated perhaps more readily than their best." (Burger, Address to the American Law Institute, 1971, 52 F.R.D. 211, 215.) In recognition of this fact, section 583.130 says it is the policy of this state that "all parties shall cooperate in bringing the action to trial or other disposition." Attorneys who do not do so are practicing in contravention of the policy of the state and menacing the future of the profession.

The judgment is reversed. Appellant will recover her costs on appeal.


                                                BEDSWORTH, ACTING P. J.
WE CONCUR:


MOORE, J.


IKOLA, J.

16